Patricia A. STEMPLE, Plaintiff,

v.

Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

Civil No. SKG–05–3336.

United States District Court,
D. Maryland.

Feb. 26, 2007.

Paul Rodney Schlitz, Jr., Jenkins Block and Associates PC, Baltimore, MD, for Plaintiff.

Allen F. Loucks, Office of the United States Attorney, Baltimore, MD, for Defendant.

## MEMORANDUM OPINION

GAUVEY, United States Magistrate Judge.

Plaintiff Patricia Stemple ("plaintiff") filed this action on December 13, 2005 seeking judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Agency"), denying her claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405(g) and Supplemental Security Income ("SSI") under Title XI of the Social Security Act, 42 U.S.C. §§ 1381–1383(c). The undersigned has this case for all proceedings by consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301. (Paper No. 5).

Cross motions for summary judgment are currently pending before this court. (Papers Nos. 18 and 23). No hearing is necessary in this case.[1] Local Rule 105.6. For the reasons stated below, the Court DENIES defendant's motion for summary judgment and GRANTS plaintiff's motion to remand the case for further proceedings consistent with this opinion.

### I. Procedural History

Plaintiff filed applications for DIB and SSI payments on April 30, 2004. (R. 69, 73, 190). The Social Security Administration ("SSA" or "Agency") denied both of plaintiff's applications on July 8, 2004, as well as her applications for reconsideration on February 10, 2005. (R. 45, 52, 196). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which took place on July 13, 2005. (R. 13,

54). On July 29, 2005, the ALJ denied plaintiff's claims. (R. 10). The Agency's Appeals Council denied plaintiff's request for review of the ALJ's decision on October 14, 2005. (R. 5). Plaintiff filed the instant action on December 13, 2005, pursuant to 42 U.S.C. § 405(g) seeking review of the final decision of the Commissioner. (Paper No. 1).

### II. Factual Background

Plaintiff was born on November 24, 1947, and was 57 years old when she testified at her July 2005 hearing before the ALJ. (R. 13, 69). At school, she was in a slow learner or special education program, and she began but never completed the tenth grade. (R. 24, 39, 83). She has never attended or completed a GED, job training, or vocational program. (R. 24, 83). In response to questions from her attorney, plaintiff stated that she can read but has difficulty with big words and cannot spell. (R. 41). She further testified that she lived with her husband, and that she measured 5'7"[2] and weighed between 220 and 230 pounds. (R. 23).

Plaintiff has had jobs in a factory and a nursing home and also worked for a total of about two and a half years in the late 1980's as a housekeeper at a Holiday Inn. (R. 32, 37). For approximately six years, until her alleged onset of disability date of October 10, 2003, she worked at Hazelwood Elementary and Middle School ("school"), a Baltimore City public school. (R. 28, 29, 69). She began as a part-time cafeteria aide, then became a classroom attendant, and finally gained full-time employment pulling and copying records that needed to be sent to other schools. (R. 28–29). This last job required standing for

---

1. Plaintiff appended a Motion for Hearing to her Motion for Summary Judgment. (Paper no. 18). The Court does not find a hearing to be necessary in this case, especially in light of the fact that the ruling is in plaintiff's favor.

2. Plaintiff's height in fact appears to be slightly shorter at 5' 6 3/4" as measured by two state agency examiners. (R. 148, 143).

much of the day as well as frequent lifting and carrying of copier paper, up to two packs at a time. (R. 29, 31, 80, 81). On an April 2004 Disability Report–Adult, plaintiff indicated that she would frequently carry less than 10 pounds for a distance of approximately 15 feet. (R. 81). She testified that it was difficult to bend over and pick up the paper; by the time she got home from work, she was in "bad shape" and had to take Tylenol.[3] (R. 30–31). She further stated on the April 2004 Disability Report—Adult that numbness in her hands was limiting her ability to work and that her conditions, diabetes mellitus[4] and hypertension,[5] caused her pain. (R. 79). Although this pain began in 2000, she continued to work and only stopped working around October 2003 when she was laid off due to the school's lack of funding.[6] (R. 31, 80).

Plaintiff testified before the ALJ that she experiences pain just below her belt line and that she especially has trouble bending over and straightening up. (R. 35). She stated that approximately twenty years earlier, a doctor had taken x-rays of her back and told her that she has arthritis in all of her joints. *Id.* Plaintiff also reported that her feet hurt most of the time. (R. 41). In forms filled out by plaintiff, she has complained of numbness in her hands, back, feet, and legs, the inability to stand or sit for a long period of time, discomfort in her knees, and continual back pain. (R. 50, 93, 101–105). She told the ALJ that she has difficulties sleeping due to discomfort in her feet and legs.

(R. 24). When her feet go numb, she cannot tolerate the bedcovers touching them. (R. 41). She does not take sleeping medications but may take a pain pill or a bath to relieve her legs and back. (R. 24). Plaintiff stated that she used to be able to walk two or three blocks but was, at the time of the hearing, only able to walk "a little ways" because of leg and back trouble and in fact had not walked in over two weeks. (R. 25–26).

Plaintiff maintains a driver's license and testified that she had driven in 2005 but had not driven in the weeks prior to her hearing, in part because of her back. (R. 23–24). She reported that she cooks, washes dishes, does laundry, vacuums, and makes the bed. (R. 24, 25 28, 36). However, with all of these activities, she must periodically stop and sit down before resuming the activity. (R. 24, 25 28, 36, 88–90). Plaintiff has indicated that when she stands and peels potatoes, the pain in her hands and waist is enough to make her cry, and that when making the bed, her back hurts to a degree that she feels she might fall. (R. 90). She is able to take care of her own personal needs but also finds this difficult because bending cause discomfort in her knees and back. (R. 105).

Other than household chores, plaintiff's main daily activity is watching television, although she does not always remember what she watches. (R. 27, 90–91). She used to sew as a hobby but is no longer able to do so because of trouble with her hands, waist, and eyes, which she has indi-

---

**3.** Tylenol is a trademark for preparations of acetaminophen, which has analgesic and antipyretic effects similar to aspirin but weak anti-inflammatory effects. *Dorland's Illustrated Medical Dictionary*, 12, 1976 (30th ed.2003) [hereinafter *"Dorland's"*].

**4.** Diabetes mellitus is a chronic syndrome of impaired carbohydrate protein and fat metabolism owing to insufficient secretion of insulin

or to target tissue insulin resistance. *Dorland's* at 506.

**5.** Hypertension is high arterial blood pressure. *Id.* at 889.

**6.** On a May 2004 Disability Determination Services ("DDS") Daily Activities Questionnaire, plaintiff indicated that she has never lost a job due to her condition. (R. 93).

cated are bad due to her diabetic condition. (R. 90–91). She noted on a report submitted to the Agency that it hurts when she writes. (R. 105). Plaintiff tries to attend church every week but usually only stays for about one and a half hours because she is unable to sit for longer. (R. 27). She speaks every day to relatives and friends on the telephone, and she visits with her sister and four children, however they usually come to see her. (R. 27, 91). Plaintiff testified that, although she is able to attend church and was able to work at the school, she has not been in a grocery store in about thirty years because of a phobia related to being around a lot of people. (R. 25, 28, 39, 40). She is also very uncomfortable riding in an elevator.[7] (R. 39).

In addition to taking Tylenol for pain, at the time of the July 2005 hearing, plaintiff was taking Novolin N by injection,[8] Dilantin,[9] Hyzaar,[10] and Glyburide.[11] (R. 35–36). She stated that she is not aware of any medicinal side effects. (R. 36). Other medications plaintiff has taken in the past include Humulin N, Lantus, Altace, Avandia, Actos, and Hydrochlorothiazide.[12] (R. 92, 104, 123, 148).

## A. Medical History: Treating Sources

According to plaintiff's medical records, she has primarily received treatment from two physicians for her diabetes and hypertension. From October 1998 through April 2004, plaintiff saw Denis [ sic] W. McDonald, M.D. ("Dr.McDonald") at over twenty appointments. (R. 118–139). During this time period, her weight fluctuated between 211 and 257 pounds and averaged approximately 224.5 pounds.[13] *Id.* Dr. McDonald's treatment notes reveal that plain-

---

7. Other than a brief discussion with the ALJ regarding this phobia, plaintiff made no further mention of suffering from any other mental condition or impairment in the remainder of her hearing testimony or in any of the forms she filled out and submitted to the Agency. However, the issue was raised by her counsel in a letter delivered to the ALJ on June 6, 2005. (R. 185).

8. Novolin is a trademark for preparations of insulin human produced by recombinant DNA technology and is used in the treatment of diabetes mellitus. *Dorland's* at 938 and 1281.

9. Dilantin is a trademark for preparations of phenytoin, "an anticonvulsant used in the treatment of epilepsy other than the petit mal type, the treatment of status epilepticus, and the prevention and treatment of seizures associated with neurosurgery[.]" *Id.* at 519 and 1422. There is nothing in plaintiff's record indicating that she has ever suffered from epilepsy. Plaintiff testified as to taking this medication but no treatment notes from any medical source refer to it.

10. Hyzaar is used to treat hypertension. Thompson PDR, *Physician's Desk Reference* (61st ed.2007), 1992 [hereinafter *PDR*].

11. Glyburide is a sulfonylurea compound used as a hypoglycemic in the treatment of type 2 diabetes mellitus. *Dorland's* at 785.

12. Humulin N is a crystalline suspension of human insulin with protamine and zinc, and Lantus is a recombinant human insulin analog. PDR at 1795 and 2912. Both are used in the treatment of diabetes. *Id.* Avandia is an oral antidiabetic agent which acts primarily by increasing insulin sensitivity. Id. at 1384. Altace is "indicated in patients 55 years or older at high risk of developing a major cardiovascular event because of a history of coronary artery disease, stroke, peripheral vascular disease, or diabetes, that is accompanied by at least one other cardiovascular risk factor," including hypertension. *Id.* at 1703. Actos is an oral antidiabetic agent that acts primarily by decreasing insulin resistance. *Id.* at 3219. Hydrochlorothiazide is used in the treatment of hypertension and edema. *Dorland's* at 871.

13. Plaintiff's average weight and her height of 5'6 3/4" give her an approximate body mass index ("BMI") of 36.2. *See* National Heart Lung and Blood Institute Obesity Education Initiative, *http://www.nhlbisupport.com/bmi/* (last visited Jan. 3, 2007). BMI is considered "a reliable indicator of [a person's] body fat."

tiff's blood sugar or glucose levels varied greatly and were often elevated, as was her blood pressure.[14] *Id.* As early as February 2000, he recorded that plaintiff was having trouble paying for her required drugs. (R. 134). In June 2003, he noted that her diabetes was uncontrolled, and by April 2004, he felt plaintiff's inability to purchase medication and the supplies needed to test her glucose represented a "serious dilemma." (R. 118, 119, 125, 131).

Throughout the course of his treatment of plaintiff, Dr. McDonald frequently indicated that she was experiencing pain in her back, elbows, shoulders, leg, and foot. (R. 118, 120, 125, 132–134, 139). Plaintiff first complained of numbness in her fin-

gers in June 1999. (R. 137). In June 2003, she told Dr. McDonald she was experiencing foot and leg pain and did not want the bedcovers touching her. (R. 125). By March 2004, Dr. McDonald wrote that plaintiff had been suffering from back pain that worsened upon bending for one to two years, that she had pain from her knees into her legs and feet, and that she had pins and needles in her fingers. (R. 120). He speculated that controlling her glucose levels, which he considered a "major health problem," might help lower her paresthesias [15] and other pain. (R. 121). Dr. McDonald's treatment notes also indicate that he contemplated giving plaintiff a prescription of Neurontin but that she could not afford that medication.[16] (R. 118, 125).

Dept. of Health and Human Svcs., Center for Disease Control and Prevention, "BMI—Body Mass Index: About BMI for Adults," http://www.cdc.gov /nccdphp/dnpa/bmi/adult—BMI/about—adult—BMI.htm (last visited Jan. 3, 2007). However, BMI calculations are screening, not diagnostic, tools. *Id.* In order for a healthcare provider to determine if a high BMI represents a health risk, he must also perform further assessments and screenings of a patient. *Id.* Social Security Rulings ("SSR" or "Rulings") follow guidelines promulgated by the National Institutes of Health. S.S.R. 02–1p (2000 WL 628049 (S.S.A.)). A BMI of 30.00 or above signifies obesity, of which there are three levels. *Id.* Plaintiff's BMI falls into Level II, which covers BMIs of 35.0 to 39.9. *Id.* According to the Rulings, "[t]hese levels describe the extent of obesity, but they do not correlate with any specific degree of loss." *Id.*

14. While Dr. McDonald noted on several occasions that plaintiff's blood pressure was elevated and that he hoped the school nurse might monitor it, he specifically indicated that it was "uncontrolled" in January 2004. (R. 122, 132).

15. A parasthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Dorland's* at 1371.

16. Neurontin is a trademark for a preparation of gabapentin, which is an anticonvulsant used as adjunctive therapy in the treatment of

partial seizures. *Dorland's* at 747, 1257. It is also marketed for the treatment of Postherpetic neuralgia, nerve pain which may follow the onset of shingles in adults. Neurontin (gabapentin), *http://www.neurontin.com/information* (last visited Jan. 3, 2007). It is worth noting that, "[t]his approved drug, which is a widely sold anticonvulsant, is being used for a variety of off-label uses including peripheral neuropathy and bipolar disease." William M. Bennet, *Off–Label Use of Approved Drugs: Therapeutic Opportunity and Challenges*, 15 J. AM. SOC. NEPHROL. 830–831 (2004), *available at http://jasn.asnjournals.org/cgi/content/full/15/3/830. See also* Wikipedia "Gabapentin," *http://en.wikipedia.org/wiki/Gabapentin* (noting frequent usage of gabapentin as pain relief medication, especially for neuropathic pain, as well as its effectiveness in the treatment of migraines and its more controversial off-label usage in treating bipolar disorder). According to a web site jointly sponsored by the U.S. National Library of Medicine and the National Institutes of Health, peripheral neuropathy is "a failure of the nerves that carry information to and from the brain and spinal cord. [It] produces pain, loss of sensation, and inability to control muscles." Medical Encyclopedia, "Peripheral Neuropathy," *http://www.nlm.nih.gov/medlineplus/ency/article/000593.htm* (last updated 7/2/04). It often affects people with diabetes, and in some cases, treatment may exclusively focus on pain management. Mayo Clinic, *http://www.mayocli nic.com/health/pe-*

According to plaintiff's hearing testimony, she stopped seeing Dr. McDonald in 2004, because she could no longer afford his services.[17] (R. 33).

In late July 2004, plaintiff began receiving medical treatment at the Baltimore Medical System clinic from Sabapathippillai Kulathungam, M.D. ("Dr.Kula"),[18] whom she estimated she sees every month to once every three months. (R. 33, 34, 165, 169, 189). Plaintiff's record contains very little documentation of Dr. Kula's treatment. In July 2004, he wrote that plaintiff's vision was a bit blurred and diagnosed her with obesity, hypertension, diabetes mellitus, and dyslexia.[19] (R. 166). He further indicated that she had come to him to have a Social Security Agency form completed and to get an eye care referral. (R. 165–166).

On November 24, 2004, Dr. Kula completed a Medical Assessment of Ability to Do Work–Related Activities (Physical) and an accompanying Memo Regarding Onset Date of Disability for plaintiff. (R. 186–189). In the memo, Dr. Kula wrote that plaintiff's only conditions were diabetes and hypertension. (R. 189). However, in the assessment, he also indicated that she has dyslexia and claustrophobia, the latter of which appeared to be improving according to plaintiff. (R. 188). Dr. Kula found that plaintiff's impairments did not restrict her ability to lift, carry, stand, walk, sit, or perform a variety of postural activities. (R. 186–187). Other than plaintiff's speech being affected by dyslexia, he felt that her impairments did not affect her physical functions or cause any environmental restrictions. (R. 188).

## B. Medical History: Government Physicians and Residual Functional Capacity Assessments

Plaintiff was first seen by a Maryland DDS consultative examiner, Gregory Ross, M.D. ("Dr.Ross") on June 28, 2004. In his July 1, 2004 Internal Medicine Report, Dr. Ross indicated that plaintiff was complaining of problems with her right foot when walking, pain in her legs from the knees down, numbness in her foot, hands, and fingers, abdominal pain that radiated into her back when bending, and back pain caused either by prolonged sitting or bending. (R. 147–148). Plaintiff also complained of occasional difficulties with blurred vision. (R. 148). Dr. Ross found plaintiff to have a full range of motion in her upper and lower extremities and the cervical and lumbar spine regions. (R. 149). Plaintiff exhibited a slight decrease in pinprick sensation in the distal lower extremities and fingertips and had difficulties walking on her toes due to pain. However, Dr. Ross felt her gait was normal, she was able to heel-walk, and there was no significant visual field loss. (R. 149).

In addition to noting her obesity, Dr. Ross's impression was that plaintiff had diabetes under poor control, back pain possibly due to arthritis, and diabetic peripheral neuropathy[20] evidenced by her com-

---

ripheral-neuropathy/DS00131 (last visited 10/24/06). In his April 2004 notes, Dr. McDonald recorded that plaintiff suffered from diabetic neuropathy. (R. 118).

**17.** Dr. McDonald's notes contain almost no references to plaintiff's mental state. In September 2002, however, he indicated that she was mentally confused and shaky. (R. 128). It is unclear if this was related to her blood sugar levels. Id.

**18.** Plaintiff, the ALJ, and both parties used this abbreviation. For the sake of clarity, the Court will utilize it as well.

**19.** Dyslexia is an inability to write, read, or spell words despite the ability to see and recognize letters. Dorland's at 575.

**20.** See supra footnote 16 for a description of peripheral neuropathy.

plaints of numbness and burning pains in her legs, feet, and hands. (R. 149). He concluded that she "should be able to sit, handle objects, hear, speak and travel," although she "may have problems with prolonged walking" as a result of foot and leg pain. (R. 150).

Dr. Ross's report was followed by an unsigned Agency Physical Residual Functional Capacity ("RFC") Assessment ("form" or "assessment") dated July 6, 2004. (R. 151–158). The form notes plaintiff's primary diagnoses as diabetes, high blood pressure, and obesity. (R. 151). It states that plaintiff can lift and /or carry 50 pounds occasionally and 25 pounds frequently, that she can sit, stand, or walk, with normal breaks, for 6 hours in an 8 hour workday, and that she has the unlimited ability to push and/or pull. (R. 152). The form records no postural, manipulative, visual, communicative, or environmental limitations other than that plaintiff should never climb ladders, ropes, or scaffolds. (R. 152–155). Whoever completed this RFC assessment indicated that the file contained no treatment or examining source statement regarding plaintiff's physical capacities. (R. 157).

A Medical Summary Report ("report") completed by examiner Victoria Geho accompanies the RFC Assessment. (R. 159). It is dated July 2, 2004, although a handwritten date says July 6, 2004.[21] *Id.* The report differs somewhat from the assessment in that it limits plaintiff's ability to lift and/or carry to 20 pounds occasionally and 10 pounds frequently. *Id.* Further-

more, it shows the examiner's recommendation for plaintiff is a light RFC.[22] *Id.*

Plaintiff was seen by a second Maryland DDS consultative examiner, Bernard S. Karpers, Jr., M.D. ("Dr.Karpers"), on January 31, 2005. (R. 171). The February 1, 2005 report from this examination details plaintiff's complaints of discomfort and numbness in her feet and heel as well as low back pain that worsened upon bending and lifting. (R. 172–173). Dr. Karpers observed that, because of her sensation impairment, plaintiff was experiencing difficulty with her gait and instability when changing positions and was using a cane for increased stability. *Id.* She also continued to complain of blurry vision, although she had no history of glaucoma or retinal disease, and she was able to read with glasses. (R. 172). Dr. Karpers recorded plaintiff's weight as 227 pounds and termed her "grossly obese." (R. 173).

Dr. Karpers's final impression was that plaintiff suffered from poorly controlled, insulin-dependent diabetes mellitus with peripheral neuropathy and controlled hypertension that was not exhibiting any complicating features at that time. (R. 174). He concluded that plaintiff "is able to sit, stand, walk, lift, carry, handle objects, hear, speak and travel as necessary." *Id.* He considered her grip strength to be normal and noticed no particular impairment in terms of range of motion in her upper extremities. (R. 174–175). In Dr. Karpers's opinion, plaintiff's complaints of low back pain were likely the result of hypokinetic disease,[23] and the absence of

---

**21.** The handwritten date of July 6, 2004 appears both at the top of the report and under a subsection entitled "Med/Psych Consultant Evaluation." (R. 159). The Court is unsure whether this indicates that a psychological evaluation of plaintiff was in fact completed.

**22.** *See infra* fn. 24.

**23.** Hypokinetic diseases are conditions related to inactivity or low levels of habitual activity. The President's Council on Physical Fitness and Sports, *http://www.fitness.gov/ digest—mar2000.htm* (last visited Jan. 4, 2007). They include diabetes, obesity, and hypertension. *See* http://www.eseniorhealth. com/html/archives/epidemic.html (last visited Jan. 4, 2007).

the deep tendon reflex on plaintiff's knees and ankles was attributable to diabetic neuropathy. (R. 174). Although plaintiff's gait and station seemed normal to Dr. Karpers, he wrote that "an ambulatory aid is definitely suggested because of the symptoms of peripheral neuropathy." (R. 175).

A second Physical Residual Functional Capacity Assessment was completed by a P.H. Moore on February 8, 2005. (R. 177–183). Plaintiff was evaluated as able to lift and/or carry 20 pounds occasionally and 10 pounds frequently and to push and/or pull without limitations. (R. 177). As with the 2004 RFC Assessment, she was considered able to stand, walk, or sit up to 6 hours out of an 8 hour workday, and no manipulative, visual, communicative, or environmental limitations were recorded. (R. 177–180). Plaintiff's only postural limitation was an inability to frequently climb ladders, ropes, or scaffolds.[24] (R. 178). P.H. Moore also indicated that the file contained no treatment or examining source statement regarding plaintiff's physical capacities. (R. 182).

### III. *ALJ Findings*

In evaluating plaintiff's claim for disability, the ALJ must consider all of the evidence in the case record and follow a five-step sequential evaluation process as laid out in 20 C.F.R. § 416.920(a). The first step requires plaintiff to prove she is not engaged in "substantial gainful activity."[25] 20 C.F.R. § 416.920(a)(4)(i). If the ALJ finds that plaintiff is engaged in "substantial gainful activity," plaintiff will not be considered disabled. *Id.* In this case, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of October 10, 2003. (R. 13–14).

At step two of the analysis, the ALJ determines whether plaintiff's physical and mental impairments, considered jointly and severally, are "severe" and whether those impairments have lasted or are expected to last at least twelve months. 20 C.F.R. §§ 404.1520 and 416.920. Here, the ALJ concluded that plaintiff had hypertension and diabetes mellitus with peripheral neuropathy. (R. 16). However, he did not feel plaintiff had a severe impairment or combination of impairments. *Id.*

Under the third step, the ALJ considers whether the plaintiff's impairments, either severally or in combination, meet or equal an impairment enumerated in the "Listing of Impairments" in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing" or "LOI"). 20 C.F.R. § 416.920(a). If plaintiff's im-

---

**24.** This description of plaintiff's residual functional capacity, *see infra* fn. 26, would seem to qualify her for light work. According to the regulations promulgated by the Commissioner, "light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A job in this category may require "a good deal of walking or standing" and "pushing and pulling of arm or leg controls." *Id.* A determination that a claimant can undertake light work also supports a determination regarding the ability to do sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

**25.** Substantial gainful activity is defined as "work activity that is both substantial and gainful." 20 C.F.R. § 416.972. Work activity is substantial if it involves doing significant physical or mental activities and even if it is part time or if plaintiff is doing less, being paid less, or has fewer responsibilities than when she worked before. 20 C.F.R. § 416.972(a). Gainful work activity is the type of work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. § 416.972(b). Substantial gainful activity does not include activities such as household tasks, taking care of oneself, social programs, or therapy. 20 C.F.R. § 416.972(c).

pairments do not meet an impairment in the Listing, the ALJ moves on to step four and examines whether plaintiff retains the residual functional capacity ("RFC")[26] to perform past relevant work.[27] 20 C.F.R. § 416.920(a)(4)(iv). If the ALJ determines plaintiff does not retain the RFC to perform such work, the burden shifts to the Commissioner at the fifth and final step to assess whether, in light of vocational factors such as age, education, work experience, and RFC, plaintiff is capable of other work in the national economy. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir.1995); 20 C.F.R. §§ 404.1520(g) and 416.920(a)(4)(v). The Agency must also prove the existence of and plaintiff's capacity to perform alternative work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). Apparently based on his determination that plaintiff's impairments, either individually or in combination, were not severe, the ALJ in the case sub *judice* did not undertake steps three, four, or five. His ultimate conclusion was that plaintiff had not been under a disability at any point through the date of his decision. (R. 17).

## IV. *Standard of Review*

The primary function of this Court in reviewing Social Security disability determinations is not to try plaintiff's claims *de novo*, but rather to leave the findings of fact to the Agency and to determine upon the record as a whole whether the Agency's decision is supported by substantial evidence and whether the correct legal standard was applied. 42 U.S.C. §§ 405(g) and 1383(c)(3); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.1996); *Hays v. Sullivan*,

907 F.2d 1453, 1456 (4th Cir.1990). Substantial evidence is "more than a mere scintilla of evidence but somewhat less than a preponderance." *Craig*, 76 F.3d 585 at 589 (citing *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.1966)). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir.1992) (quoting *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Id.* (quoting *Celebrezze*, 368 F.2d at 642).

In its review for substantial evidence, this Court does not determine the weight of the evidence or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456 (citing *Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 519 (4th Cir.1962)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir.1987). Therefore, the deferential standard of review applied to the Agency's finding of fact does not apply to its conclusions of law or its application of legal standards and procedural rules. *Wiggins v. Schweiker*, 679 F.2d 1387 (11th Cir. 1982).

It should be noted that the Court must keep some additional considerations in mind when reviewing disability determinations. First, hearings on applications for Social Security disability benefits are not adversary proceedings. *Easley v. Finch*,

---

26. RFC is an assessment of plaintiff's maximum remaining ability to do sustained work-related physical and mental activities in a work setting eight hours a day, five days a week, or an equivalent work schedule. SSR 96–8p (1996 WL 374184 (S.S.A.)).

27. Past relevant work usually only includes work activity performed in the last fifteen years or fifteen years prior to the onset of a disability. 20 C.F.R. §§ 404.1565. Additionally, it is limited to work that was substantial gainful activity and that lasted long enough for plaintiff to learn to perform it. *Id.*

431 F.2d 1351 (4th Cir.1970). Second, the Social Security Act is a remedial statute that is to be broadly construed and liberally applied in favor of beneficiaries. *Dorsey v. Bowen*, 828 F.2d 246 (4th Cir.1987). Finally, a claimant is entitled to a full and fair hearing, and any failure to have such a hearing may constitute sufficient cause to remand the case. *Sims v. Harris*, 631 F.2d 26 (4th Cir.1980).

## V. *Discussion*

On appeal, plaintiff raises two main arguments in support of her position that the Commissioner's decision is not supported by substantial evidence: (1) there is no basis for the ALJ's determination that plaintiff's physical impairments are not severe; and (2) the ALJ failed to evaluate plaintiff's mental impairments. (Paper no. 18, 4 and 6).

### A. Severity of Plaintiff's Physical Impairments

Plaintiff first contends that the ALJ's determination that her physical impairments were not severe is unsupported by the evidence and runs counter to the Fourth Circuit's test for severity. (Paper No. 18, 6). She further contends that the ALJ did not consider the severity of her combination of impairments, specifically her peripheral neuropathy and obesity. *Id.* As her work at the school required her to stand for much of the day, plaintiff feels that "even a moderate inability due to peripheral neuropathy pain · and obesity would … impact her ability to perform past relevant work." *Id.*

Defendant counters that plaintiff did not meet her step-two burden of demonstrating that her impairments, either individually or in combination, significantly limited her ability to do basic work activities. (Paper No. 23, 12). While defendant recognizes that a severity showing in this Circuit need only be *de minimis,* she states that the mere presence of a docu-

mented condition is insufficient to satisfy plaintiff's step-two burden. *Id.* at 12–13. Defendant argues that the evidence before the ALJ indicated that plaintiff's impairments had no more than a minimal effect on her ability to perform basic work or daily activities. *Id.* at 12–14. Moreover, plaintiff's conditions were controlled by medication, existed when she was working, and did not cause her to leave her job. *Id.* at 14. Finally, defendant argues that, although the ALJ did not specifically name obesity as one of plaintiff's impairments, he did fully credit medical records that contained opinions regarding her weight, and therefore, he did properly consider and evaluate the effect of plaintiff's obesity. *Id.* at 15–16 (citing *Skarbek v. Barnhart,* 390 F.3d 500 (7th Cir.2004)).

### 1. Fourth Circuit Severity Standard

At step two of the five-step sequential analysis, the ALJ must consider the severity of an impairment both individually and in combination with a claimant's other impairments. *See* 20 C.F.R. § 416.920. *See also* 20 C.F.R. § 416.923 ("We will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity"); *Cook,* 783 F.2d at 1174 (the Agency "must make a specific and well-articulated finding as to the effect of the combination of impairments") (citations omitted). The Fourth Circuit has held that an impairment is "severe" unless it "has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler,* 734 F.2d 1012, 1014 (4th Cir. 1984). *See also Simpson v. Barnhart,* WMN–02–2126 at 31 (2003) (unpublished).

■ The severity standard is a slight one in this Circuit and the plaintiff's condi-

tions seem clearly to meet it. First, there is a great deal of evidence in the record that plaintiff had difficulty walking. Plaintiff herself testified that she was having trouble walking distances as short as two blocks. (R. 25–26). In March and April 2004, Dr. McDonald, whose treatment notes the ALJ discusses only minimally,[28] indicated plaintiff was suffering from leg and foot pain as well as diabetic neuropathy. (R. 118, 120). In July 2004, Dr. Ross also stated that plaintiff had peripheral neuropathy and might have issues with prolonged walking. (R. 149–150). Finally, in February 2005, Dr. Karpers wrote that a walking aid was "definitely suggested" for plaintiff. (R. 175). Walking problems or the need to use an ambulatory aid are certainly limitations that could have more than a minimal effect on a person's ability to work. However, the ALJ's decision does not explain how plaintiff's limitations in this respect factored into his step two analysis or how it compared to the Fourth Circuit's de *minimis* severity test.

Second, there seems to be an assumption on the part of the ALJ and defendant that the status of plaintiff's impairments did not and could not have changed since her job loss in October 2003. Both emphasized the fact that plaintiff did not leave her job due to medical reasons but because of the school system's lack of funding. (R. 16; Paper 23, 10). What neither mentions is that much of the evidence in the record-including three sets of treatment notes from Dr. McDonald, all of the records from Dr. Kula, the reports from both consultative examiners, several forms filled out by plaintiff, and her hearing testimony-post-dates plaintiff's job loss. (R. 22–42, 50, 79–83, 88–93, 101–105, 118–122, 147–150, 161–165, 171–175). The mere fact that plaintiff did not leave her job because

of her impairments does not signify that she worked free of physical difficulties or pain or that her condition did not worsen between October 2003 and her July 2005 hearing, thereby resulting in an increased, negative impact on her ability to work. For example, in April 2004, plaintiff wrote in a Disability Report–Adult that she worked even though her disability bothered her, (R. 79), and in another Disability Report ten months later, in February 2005, plaintiff stated that her hands, back, knees, and legs were all getting worse. (R. 101). Perhaps most significantly, medical evidence seems to suggest a debilitation; by February 2005, Dr. Ross's July 2004 remark that plaintiff might have trouble with prolonged walking had turned into Dr. Karpers' statement that a walking aid was "definitely suggested." (R. 150, 175).

In addition to ignoring the possible significance of the date of much of the evidence in the record, the ALJ and defendant focused on plaintiff's continuing ability to undertake household chores while neglecting to mention any of her repeated complaints, such as in a May 2004 Daily Activities Questionnaire and at the July 2005 hearing, that these chores could only be completed in multiple steps. (R. 16, 24–25; 89–90; Paper 23, 14). As with plaintiff's ambulatory limitations, the ALJ did not address how plaintiff's pain and related complications would or would not affect her ability to do work.

■ Third and finally, the ALJ's heavy reliance on the records from Dr. Kula was misplaced. (R. 16–17). At the time he completed his evaluation of plaintiff's RFC, Dr. Kula had been treating plaintiff for less than four months and had seen her on only three occasions. (R. 161–165, 186–

---

**28.** Despite Dr. McDonald's lengthy care of plaintiff, the ALJ only mentions his treatment notes in so far as they record plaintiff's own monitoring of her blood sugar levels and the level of those readings on two occasions. (R. 15).

188). His treatment notes—fill-in-the-blank forms with very few handwritten notations—do not clarify on what "medically acceptable clinical and laboratory diagnostic techniques" he based his assessment of plaintiff's RFC.[29] In no sense do Dr. Kula's notes resemble the extensive and thoughtful reports completed by Drs. Ross and Karpers, even though each of those consultative examiners saw plaintiff only once as opposed to three times. (R. 147–150, 171–175). Perhaps of greatest importance to the Court's analysis regarding the weight given to Dr. Kula's assessment is the ALJ's statement that "there are no opinions of record from any physician who has actually examined the claimant that conflict with that of Dr. Kula."[30] (R. 17). In support of this conclusion, the ALJ wrote that "the only statement of record by an examining physician that might be considered inconsistent is Dr. Ross's statement that the claimant *might* have problems with walking." *Id.* (emphasis in original). What the ALJ omits in his analysis is Dr. Karpers' notation in February 2005, over two months *after* Dr. Kula had completed his RFC evaluation, indicating that plaintiff had difficulty with her gait, was experiencing instability in changing positions, and should "definitely" use a cane when walking due to complications related to peripheral neuropathy. (R. 171–175). Furthermore, as far as the Court can determine from the record, Dr.

Kula does not once discuss or even allude to plaintiff's pain or numbness, an issue documented not only by plaintiff herself in the various forms she completed but also by Drs. Ross and Karpers as well as Dr. McDonald, who, unlike Dr. Kula, had treated plaintiff on a frequent basis for an extended period of time. The ALJ's decision does not explain how this inconsistency factored into his attribution of controlling weight to Dr. Kula's opinion.

## B. Consideration of Obesity

Another issue not addressed by the ALJ's decision is plaintiff's obesity. Although the Social Security Agency removed obesity as a separate listing from the Listing of Impairments in October 1999, rulings promulgated by the Commissioner forcefully underscore that obesity is still considered "a medically determinable impairment" whose effects adjudicators must consider when evaluating disability, including the severity of an individual's impairments. SSR 02–01p at *1 and *3 (2000 WL 628049 (S.S.A.)) [hereinafter SSR 02–01p] (obesity is to be considered by the ALJ at all but step one of the five-step sequential analysis). Ruling 02–1p reminds adjudicators that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id.* at *1. In this regard, the LOI specifically discusses the effects of obesity in

---

29. Agency regulations state that, due to the nature of the treating relationship, the opinion of a treating source is generally given more weight than other opinions contained in the record and may even be given controlling weight regarding the nature and severity of plaintiff's impairments when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [consistent] with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir.2001); S.S.R. 96–2p (1996 WL 374188).

30. Where a treating physician's opinion is inconsistent with substantial evidence or not supported by clinical evidence, "it should be accorded significantly less weight." *Mastro,* 270 F.3d at 178 (quoting *Craig v. Chater,* 76 F.3d 585, 590 (4th Cir.1996)). In such an instance and in the face of persuasive evidence to the contrary, the ALJ has the discretion to grant less weight than usual to a treating physician's testimony. *Id.* (citing *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992)).

relation to impairments of the musculoskeletal, respiratory, and cardiovascular systems, and the ruling uses as an example the fact that obesity can often complicate a chronic disease such as diabetes mellitus. *See* 20 C.F.R. § 404, Subpart P, Appendix 1, §§ 1.00(Q), 3.00(I), and 4.00(F); SSR 02–01p at *3.

As with any other medically determinable impairment, obesity will be deemed a "severe" impairment when, either alone or in combination with other conditions, "it significantly limits an individual's physical or mental ability to do basic work activities." SSR 02–01p at * 4. However, the Agency's ruling on obesity, echoing the Fourth Circuit in *Evans,* makes clear that the standard for a finding of severity is quite low: "an impairment(s) is 'not severe' only if it is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities[.]" *See id.* Furthermore, no specific level of Body Mass Index or description of obesity, e.g., "morbidly obese," can be equated with a "severe" or "not severe" impairment. *Id.* An individualized assessment must be undertaken in each case in order to determine "the impact of obesity on an individual's functioning" and its severity or lack thereof.[31] *Id.*

Despite the seeming clarity of the Agency's instructions regarding the consideration of obesity, some courts have found harmless error in certain cases where the ALJ fails to discuss a claimant's obesity. *See, e.g., Rutherford v. Barnhart,* 399 F.3d 546, 551–552 (3rd Cir.2005); *Skarbek,* 390 F.3d 500, 504 (7th Cir.2004); *Bledsoe v. Barnhart,* 165 Fed.Appx. 408, 410 (6th Cir.

2006); *Golfieri v. Barnhart,* No. 06–14–B–W, 2006 WL 3531624, at *6 (D.Me. Dec. 6, 2006); *Cruz v. Barnhart,* No. 04 Civ 9011(GWG), 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006); *Zeno v. Barnhart,* No. 1:03–CV–649, 2005 WL 588223, at *5 (E.D.Tex. Feb. 4, 2005). In *Skarbek,* the case first articulating this approach, the Seventh Circuit Court of Appeals wrote as follows:

An ALJ is required to consider impairments a claimant says he has, or about which the ALJ receives evidence. Although Skarbek did not specifically claim obesity as an impairment (either in his disability application or at his hearing), the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment. Despite this, any remand for explicit consideration of Skarbek's obesity would not affect the outcome of this case. Notably, Skarbek does not specify how his obesity further impaired his ability to work, but speculates merely that his weight made it more difficult to stand and walk. Additionally, the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity. Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.

*Skarbek,* 390 F.3d at 504 (citations omitted). Although the Court recognizes the reasonableness of this approach, it is unwilling to find harmless error in the case *sub judice* for three reasons: (1) this principle has not yet been discussed or

---

**31.** Ruling 02–1p also states that, "[a]s with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." SSR 02–01p, at *7. This statement appears specifically at the end of a section discussing the evaluation of obesity in assess-

ing RFC in adults, i.e. steps four and five. *Id.* Given the general "duty of explanation," the Court assumes an ALJ must likewise explain his conclusions regarding obesity at step two. *See Gordon v. Schweiker,* 725 F.2d 231 (4th Cir.1984).

adopted by the Fourth Circuit Court of Appeals; (2)the facts currently before the Court are distinguishable from those in cases where courts have applied the harmless error rule for obesity; and (3) both the Fourth Circuit and S.S.R. 02–1p are clear regarding the *de minimis* standard required for a finding of severity at step two.

As in *Skarbek*, plaintiff has not specified or even speculated how her obesity has further impaired her ability to work.[32] On the other hand, unlike *Skarbek*, the ALJ in this case did not go beyond step two of the five-step sequential analysis and did not adopt *"any* limitations suggested by the specialists and reviewing doctors, who were aware of [her] obesity."[33] *Id.* (emphasis added). This Court has surveyed cases in which courts have adopted and applied the harmless error principle, and in all of them, the ALJ found the claimant to suffer some sort of severe impairment; in other words, in each case, the ALJ found the claimant in question ineligible for SSI or DIB based on analysis at steps three, four, or five, not step two. *See, e.g., Rutherford*, 399 F.3d at 549–552 (ALJ found claimant to have severe impairments at step two but concluded at step three that claimant had no per se disability and at step five that claimant could perform jobs available in the national economy); *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir.2006) (ALJ reached step five); *Skarbek*, 390 F.3d at 503 (ALJ found severity at step two but felt plaintiff had RFC to perform a limited range of medium work); *Bledsoe*, 165 Fed.Appx. at 410

(ALJ's determination favorable to claimant at steps one and two); *Golfieri*, 2006 WL 3531624, at *6 (ALJ determined plaintiff capable of only light work despite opinion of two DDS reviewers finding capability for medium work); *Cruz v. Barnhart*, 2006 WL 1228581, at *6 (ALJ undertook all five steps of sequential analysis); *Guadalupe v. Barnhart*, No. 04 CV 764(HB), 2005 WL 2033380, at *3 (S.D.N.Y. Aug. 24, 2005) (ALJ reached step four of the five-step analysis); *Zeno*, 2005 WL 588223, at *2 (ALJ completed all five steps of sequential analysis). Moreover, in two of these cases, the ALJ either explicitly mentioned the claimant's obesity in the finding of facts, *Bledsoe*, 165 Fed.Appx. at 412, or noted the claimant's height and weight in his decision. *Guadalupe v. Barnhart*, 2005 WL 2033380, at *6. The ALJ in plaintiff's case did neither of these things, and given the early stage at which he stopped his analysis, this Court is unwilling to declare that plaintiff's obesity was sufficiently taken into consideration simply because the ALJ made routine references to having considered the entirety of record. (R. 16). *See Boston v. Barnhart*, 332 F.Supp.2d 879, 885–887 (D.Md.2004) (reversible error where an ALJ failed to acknowledge obesity or its effect on a plaintiff's other impairments).

Given the documented seriousness, if not severity, of plaintiff's diabetic condition, as well as Ruling 02–1p's explicit discussion of diabetes in conjunction with obesity, a proper assessment of the severity of plaintiff's impairments cannot be undertaken without looking at the combined effects of

---

**32.** Plaintiff first raised the issue of obesity in correspondence attached to her Request for Review of Hearing Decision/Order submitted to the Appeals Council on August 9, 2005. (R. 198–199).

**33.** In addition, while both consultative examiners, Drs. Ross and Karpers, noted plaintiff's obesity, neither undertook a comprehensive

RFC. (R. 157–150, 171–175). Therefore, although these doctors indicated plaintiff had some physical limitations, particularly in terms of walking, they presented relatively few work-related limitations for the ALJ to adopt, and they did not discuss exactly how plaintiff's obesity affected her other impairments. *Id.*

*all* of her impairments, that is hypertension, diabetes, and obesity, as well as symptoms due to peripheral neuropathy. *See* S.S.R. 02–1p, at *1 ("the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately"). *See also* 20 C.F.R. § 416.923; *Cook,* 783 F.2d at 1174. This failure on the part of the ALJ to consider the combined effects of plaintiff's impairments contravenes Agency regulations and rulings, as well as Fourth Circuit precedent, and thereby renders his decision unsupported by substantial evidence.

On remand, the ALJ should, at step two, re-evaluate the severity of plaintiff's impairments, including obesity, according to the standards of *Evans* and as per the dictates of S.S.R. 02–1p. Should the ALJ find plaintiff's impairments severe, either individually or in combination, plaintiff's obesity must also be taken into account at steps three, four, and five of the five-step sequential analysis. S.S.R. 02–1p.

## C. Evaluation of Plaintiff's Mental Impairments

Plaintiff's second argument is that the ALJ failed to evaluate her mental impairments and neglected to follow the Agency-mandated procedure used to determine whether a mental impairment exists.[34] (Paper No. 18, 4). She points to several factors that might have triggered an investigation of a mental impairment: (1) plaintiff's enrollment in a special education program when she was in school; (2) her need, observed by an Agency interviewer, for her husband's help in order to answer most questions on a 2004 Disability Report–Adult; (3) her testimony regarding her phobias about grocery stores; and (4) Dr. Kula's assessment that she suffered from (improving) claustrophobia and dyslexia. (Paper No. 18, 4–5; R. 24–28, 39, 83, 86, 166). Moreover, based on her counsel's June 6, 2005 letter to the ALJ highlighting her enrollment in special education, her dyslexia, and a speech defect, and requesting a consultative psychological examination, plaintiff alleges that "the

**34.** When a claimant alleges disability due to a mental condition, in addition to the five-step analysis, the Agency must, at every level of review, follow the special technique for the evaluation of mental impairments set forth in 20 C.F.R. § 404.1520a. *See Baker v. Chater,* 957 F.Supp. 75, 79 (D.Md.1996). The technique is designed to help "(1) identify the need for additional evidence to determine impairment severity; (2) consider and evaluate functional consequences of mental [impairment] relevant to [a claimant's] ability to work; and (3) organize and present [the Agency's] findings in a clear, concise, and consistent manner." 20 C.F.R. § 404.1520a(a). When applying the technique, the ALJ is first supposed to evaluate whether plaintiff has any medically determinable mental impairments. 20 C.F.R. § 404.1520a(b). Where such an impairment is found, the ALJ is required to document the symptoms, signs, and laboratory findings that substantiate the presence of and rate the degree of functional limitation caused by any impairments. *Id.* Functional limitations are

rated in four broad areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3) (citing section 12.00C of the Listing). These ratings are followed by a determination regarding the severity of any mental impairment. 20 C.F.R. § 404.1520a(d). Where severity is found, the ALJ must assess whether the mental impairment in question meets or is equivalent to any mental disorder in the Listing. *Id.* If a mental impairment is severe but fails to meet or equal any listing, the ALJ considers plaintiff's RFC. *Id.*

The ALJ must incorporate any pertinent findings and conclusions based on the special technique in his written decision. 20 C.F.R. § 404.1520a(e)(2). The decision should also discuss what evidence the ALJ considered in reaching his conclusion about severity of any mental impairment as well as specific findings regarding the degree of limitation found in each of the four broad functional areas. *Id.*

ALJ was alerted well before the hearing" that development of the record on this point was necessary. (Paper no. 18, 4; R. 185).

Defendant counters that there is no credible evidence that plaintiff suffers from a severe, medically determinable impairment. (Paper no. 23, 10). She concedes that plaintiff was in a special education program and that she has claustrophobia but notes that these conditions did not prevent plaintiff from working in the past or cause her to leave her job, there is no evidence they have worsened, and plaintiff did not allege any mental impairments on her original or subsequent applications for SSI or DIB. *Id.* at 10–11. Defendant further contends that the ALJ's failure to discuss his evaluation of any alleged mental impairment was, at best, harmless error, as plaintiff did not "demonstrate any evidence indicating that her alleged impairment would render her unable to work." *Id.* at 11.

Based on the reasoning offered by defendant, the Court finds that the ALJ's lack of evaluation of plaintiff's alleged mental impairments is likely harmless error. However, as this case is subject to remand on other grounds, as discussed above, the ALJ should consider (but the Court is not ordering) obtaining a consultative psychological exam, if one does not already exist,[35] and applying the special technique to plaintiff's claustrophobia, dyslexia, speech impediment, and any problems with intellectual functioning she may have. *See* 20 C.F.R. § 404.1520a(a) (noting that the special technique is designed to assist in the identification of "the need for additional evidence to determine impairment severity" and in the consideration and evaluation of how a mental impairment may or may not be relevant to a plaintiff's ability to work).

**35.** *See supra* fn. 21.

## VI. *Conclusion*

For the above reasons, this Court DENIES the defendant's motion for summary judgment, DENIES the plaintiff's motion for summary judgment but GRANTS plaintiff's motion to remand the case for further proceedings consistent with this decision.